May it please the court. John Greil, University of Texas Law and Religion Clinic. I'm here on behalf of Gary Perez and Matilda Torres who are in the courtroom today. Counsel, this case is about the unnecessary destruction of a religious practice. Gary Perez and Matilda Torres, like their ancestors before them, practiced their religion at a specific spot on the San Antonio River, where the stars above them, the nesting cormorants in the trees around them, and the river below them are components of their religious services. The City of San Antonio is proposing to renovate a public park in a way that will remove those trees, deter those birds, and for months they blocked access for my clients to that sacred location. The Supreme Court has made clear that when strict scrutiny applies, if the government can accomplish its interest in a way that does not burden the religious practice, it must do so, but here the City of San Antonio has not even tried. The testimony of the project manager for the city, Jamal Moreno, puts it succinctly, this tree removal design was chosen, quote, without any consideration of the plaintiff's free exercise request, end quote, and it was not revised because doing so, quote, would take time and money we would like to proceed with the project, end quote. That's also not the process that the Texas legislature set out in the Texas Religious Freedom Restoration Act. That statute requires people of faith to provide 60 days written notice to government actors because the legislature wanted government actors to work together with believers to find an accommodation that would work for both sides. If the district court's decision is allowed to stand, people of all faiths in Texas will lose out as government actors will disclaim any effort to investigate alternatives and then in court testify that they can't think of alternatives because they never investigated them. Can I ask a couple quick fact questions? Short answers on terms of why the access claim is not mooted. The city's past actions in determining what is a danger show that the city can't be trusted with that discretion going forward. For months, the only danger was a single hanging branch that the city was able to remove in less than a day after the district court ordered it, but they would not send in an arborist to do that until the district court ordered them to do so. What is the current access restriction? There is no current access restriction. We believe it is not moot because the city, in its footnote three, says that in the passive voice, if a danger arises, which means in the Department of Parks and Rec's discretion, they determine a danger arises, they will close it off again. Sorry, just to clarify, you're being candid. There's no current access restriction even to individuals who want to go and pray in the sacred area? Correct. Okay, the other quick questions I had just factually is would you say there's some tension between your argument that they've ignored you and the fact that the city did have seven, was it seven, public hearings? I don't think that there's a tension there because the city had public hearings where they listened to my client's testimony, but the city did not take any actions that incorporated. And also the undisputed evidence is they said they wouldn't take into account? Is that correct or is that an overstatement? The evidence says that the city's position is that they had no obligation to do so when it comes to religious objections. So I believe that this is paragraph 49 of their findings. In fact, they disclaim any obligation to treat religious objections differently than environmental or historical objections. And the problem with that is that Texas RFRA, as well as the Constitution, provide different rights for religious objections. For instance, if there were a city ordinance that prohibited a certain design for historical reasons, then that would get trumped by Texas RFRA. So the fact that the city in their findings, in fact, said we don't have to treat religious objections differently shows that they were not going to give those objections the credence that they merited under Texas statute. Your preferred wall reconstruction or your effort to show a lesser restrictive was the pier and spandrel. Is that how it's called? Yes. But that would still have required some trees to have been cut down. That's correct. At that point, I'm not trying to be sarcastic. And you may tell me this is intruding on sincerity. But if some trees are being cut down or only human planted ones, does that not substantially burden religious convictions if it's dead trees or human planted ones? Or is that not something courts can ask about? So my clients testified that they have no objection to dead and dying trees being removed. They have no objection to the walls being repaired and they understand that part of that means that some trees will be removed. That's why this phrase of spiritual ecology is a more effective way to think about the religious belief than each individual tree. So our expert, Dr. Shafik, testified that 10 significant trees would need to be removed out of the current 83. And my clients testified that that would not burden their religious beliefs because the cormorants would be able to nest. Is it undisputed which of the trees are, quote, sacred versus the ones that are not? Is there some dispute here as to which ones, you know, have antiquity and fit into the religion versus ones that may be human made and so forth? So even up to 10, is it clear that those are ones that do or don't have sacred significance? So it's incorrect to think about which tree is sacred. That's why the spiritual ecology, it's the ability to nest there as a whole. So I'd point to some testimony from Matilda Torres. This is at 140.141 of the rough transcript, which I'm going to cite too because that's what we used in our brief. Quote, those seeds keep falling and those trees keep growing. Trees do die, but it's still a continuation of what's there. There's equivocal, at best, testimony that these trees are human planted. They only appear to be human planted. But my clients testified that they believe that these trees are the continuation of the trees that were there 4,000 years ago. And under Thomas vs. Review Board, that belief is what's significant. Comprehensible or incomprehensible, right? That's correct. And I would submit that my clients put forward a very articulate description of their views. Of course, let's say that's dignified. But let's also accept that the cormorant excrement is a severe public hazard. Would you accept that and therefore say there's a compelling need for the government to protect people from that amount of bird poop? And yet, therefore, the RIFRA predicament is there are lesser methods to get at it. So I don't accept that as a compelling interest. And I'd point to – so this is Defendants Exhibit 17, which the city cites, too, on page 10 of their brief. That's a press release that the city pointed out saying that the egret populations and the brookery locations are at Lambert Beach. That's the project area. But also Bracken Ridge Park Conservancy Office, the Joski Pavilion, and the playground. Those are all areas that are outside of the project area. But the city says on page 54 of their brief they only employed zero nesting inside the project area. So if the city actually cared about eliminating bird feces, then they would deploy anti-nesting everywhere that the brookery was. But they don't care about the feces. That's the issue that you saw in Church of Lukumi, where if a government leaves appreciable damage to the supposedly compelling interest, then the government undermines that interest. Legally, could you speak to Ling? Am I pronouncing it right? Because they are – in a simplified version, the court stated that the government can construct a road through a forest that has religious significance. So why isn't that fairly close to this situation? So I note under Texas RFRA, I don't think Ling applies at all. The Barr v. City of Sinton case is really the North Star for Texas RFRA. That's the only case that the Texas Supreme Court has done merits analysis. In that case, the court did a dictionary ordinary meaning approach and determined that a substantial burden is determined according to, quote, the degree to which a person's religious conduct is curtailed and the resulting impact on his religious expression. And if, as the amicus brief points out, if it's impossible to perform your religious services, that is a burden. Even taking Ling on its own terms, that case applied the internal affairs doctrine. That's why its main case was Bowen v. Roy about assigning a social security number to someone. And those cases are about how the government manages its own business. And what's important about the public park aspect of what's happening in Brackenridge Park is that public parks exist for public use. So when the city makes a determination about what's happening in a public park for public use, it's not just managing its own internal affairs. It's reaching out onto the actions of the believers. It's prohibiting the religious services. And then as to the actual facts, what the plaintiffs were asking for in Ling is much more than what my clients were asking for. They required privacy. They required solitude. The court said we would need to grant you an affirmative property right to exclude other people coming in. And the court noted that, quote, no sites where specific rituals take place were to be disturbed because the government went through so much effort to make that the least restricted means. So if this case looked like Ling, it would look like my clients objecting to a volleyball court a hundred yards down the river that caused too much disturbance for them to focus. So I don't think that Ling applies under Texas law or under its own terms. And I would like to describe briefly this idea of the cantilever versus the pier and spandrel drilling through the front. I think that this can be kind of hard to get from the briefs, but the idea is that the retaining wall is the historical structure. The city says for the cantilever system, it needs to dig about 10 feet of trench behind that wall. And so obviously all of the trees in that 10 foot trench need to be removed. And the pier and spandrel system, you only need 18 inches behind the wall. That's why it's a better design for preserving trees. Now, if you can drill through the front of the wall to attach that pier and spandrel to the retaining wall, then you don't need to dig a big trench behind the wall. Sean Franke, the city's outside engineer, testified at least three times that he believed the pier and spandrel was unavailable because of the Secretary of Interior regulations. So he said on 622 of the transcript that he couldn't do pier and spandrel because of the Secretary of Interior regulations. He says at 627 that other designs would, quote, save more trees, but he could not do them because of regulations. And he testified that he did not do any calculation of the cost of alternatives because the regulations eliminated it. That's 631. But he is not an expert. He testified that he doesn't know if guidelines apply or if exemptions are available. He, quote, relies on other people. That's 646 of the transcript. And the city has still never pointed to any federal regulation or state regulation or city ordinance that actually has this requirement about not drilling through the front. So when the city has estimates about the cost, they testify that they never actually ran the estimates because of this phantom regulation. So it's the city's burden to show that the cantilever system is the least restrictive means. And if they never even ran alternative designs, I don't know how they can possibly meet their burden. Two questions about that. If it were in the record that it costs $50 million, would that then be somehow – would we have analysis of accommodation law that would say that doesn't need to be considered? That would go to the least restrictive means, and I can imagine. The cost does factor in. Absolutely. But in the record, that your proposed alternative is more costly unless you sort of offset the $450,000, right? Well, we don't know that it's more costly because the city never actually ran a cost estimate. Jamal Moreno, who is the project manager, was asked what the cost of the pier and span drill would be. And at 371 of the transcript, he said, quote, he does not know. Sean Franke, the city's outside engineer, testified that he did not do the calculation. So that's 631. So it's the city's burden to prove that cost is an obstacle. I thought you had offsetting figures that if you don't have to do the trees, it's actually going to save half a million. There is an offsetting figure, yes. I believe it's a live oak directly north of that sacred point. That is a massive tree that the city says would take $400,000 to relocate back. It's unclear whether that tree would survive that. The city put in no expert that would actually suggest it would survive, but that would save the city money. Yes. My recollection back a while when this was set was that the Corps of Engineers had to weigh in as part of this decision-making in terms of the construction project itself, et cetera, and I'm not quite sure. I can't remember whether that took into account these alternatives or whatever. But somehow the Corps of Engineers was wired into this. I don't remember in the briefing that came later whether that dissipated or not. Is that still not a concern? Does the Corps of Engineers have some approval or not on which type of construction that can be done that they approve? Yes. The city still needs to obtain an approval from the Army Corps of Engineers. I believe that the Corps is waiting on the decision from this court before, but I'm not sure. They're waiting to find out what the ultimate project is. Correct. Is there no further questions? Can I ask just one more quick? Are you arguing or preserving the argument that as to the federal free exercise clause, employment division versus Smith should be reassessed, or are you accepting that legal framework and saying that if we conclude this is a neutral and generally applicable law, you would still say you win? We believe employment division v. Smith was wrongly decided under the original meaning of the free exercise clause, but we also believe that because these are not neutral and generally applicable government actions, it does not apply to this case. Okay. Thank you. May it please the court. Jane Weber, and I'm here today, privileged today, to represent the city of San Antonio in this interlocutory appeal from the district court's denial of preliminary injunction, and we urge the court to affirm the district court's order because the district court did not abuse his discretion in determining on this very fact-intensive record that the city's activities to rehabilitate Bracken Ridge Park do not substantially burden plaintiffs' sincerely held religious beliefs, and second, they are the least restrictive means to advance a compelling government interest. The general standards for application for analysis of free exercise cases apply here, but there are a few particular circumstances here that in this appeal that I think place it in a little bit of a different posture than most free exercise cases coming before the courts. First, there is no dispute that there is a compelling government interest in repairing the North River Bank of the San Antonio River that is across from the sacred area. The only dispute is regarding methodology. Well, is it correct that there need not be any repairs to the walls in the sacred area? There is not going to be any repair in the sacred area. And yet it was fenced off. It was fenced off because there was a hanging branch above it, 15 feet long, a hanging branch in one of the bald cedar trees, the bald cypress trees that flank the area, and that was taken out in October, and then the area was completely opened, and there is zero access restriction. That may be, and I'm not hearing him disagree too much, for some reason I thought the district court's ruling here was allowing group access but not individual access. Yes, Your Honor. Judge Beery's injunction order allowed the city to keep the fencing up. It did two things. His order regarding access did two things. First, it ordered the city to remove that hanging branch, which we hadn't touched anything once this litigation began. We're not touching any trees. We've got a lawsuit in place. We're disputing touching trees. We're not touching any trees. But Judge Beery did two things. First, he ordered us to remove the branch, and then he said, once you've removed that branch, then we will authorize small groups of folks to come and worship under these circumstances in these hours for just this time. And what the city did was open it up freely. That branch has now been removed. The danger to public safety of individuals has been removed, and we opened it completely. So we went beyond what… Wholly moot. All access contentions are wholly moot. There is no effectual relief that this court can give in this injunction proceeding that the plaintiffs don't already have vis-a-vis access. The thing that's not disputed is the compelling government interest in repairing the North River Bank across from the sacred area. And that's something that's unusual, because you don't usually have an undisputed circumstance of whether or not there's a compelling governmental interest. They don't dispute that. But then it may really just come down to, does that compelling interest to fix that wall require as many trees in the sacred area to be chopped down? That's the second thing that is… Well, there are not going to be any trees in the sacred area. There are not going to be any left? There aren't going to be any detached. They're not going to be removed. They're not going to be touched in the sacred area. Across from the sacred area on the North Bank is where trees will be impacted. And that's the second thing that makes this… that is a little unusual about the facts here is the dispute about methodology. It entails technical, conflicting technical engineering evidence regarding engineering methods and the physical impact of construction activities on trees in that area. So the… If that's true, what's your best record site that, faced with conflicting possibilities, the city did consider their religious convictions? In other words, what's the best record site that they actually looked at this pier option, which would lead to fewer trees going down? There's a lot of it. Well, just give me your best one. The best one where it wasn't just we listened, but we actually accommodated. Well, I think testimony of two different witnesses. First, the testimony of Jamal Moreno, who was the project manager, and he explained that in the… This is something, if I may, Your Honor, in answering your question, I'd like to talk more broadly about process. Well, I just… you can do that. I just would love a record site where it wasn't we listened to them, but we actually told them why their less tree removal method couldn't be done for the walls. Well, I don't think we have a… we sat down in a meeting and we said to Mr. Perez and Ms. Torres, here's what we've done. There's not a record of that, but what there is a record of, I think that the best record testimony comes from Shannon Miller, who is the director of… and this is at ROA 4661 through 63. And she testifies, and this is kind of the icing on the cake, the cap, of what is a fulsome record of… What does she say? And what she says is, we convened a meeting. The question of the pier and spandrel and the viability of pier and spandrel had come back up again, not just from the plaintiffs, but also from another local group, the River Road Preservation Association, another stakeholder in the area. And they had an expert, Moises Cruz, who said, I've done this study and I think pier and spandrel is a viable option. It'll save some more trees. And so the city convened a meeting on March the 1st, 2023. This was after… this is… the project has been in place for… had commenced more than a year before. The city had been studying things all along, but then there was a come together specifically to analyze, is there a way that we can save more trees? And at that meeting were all of the decision makers involved in this project. Shannon Miller, who was from the city's Historic Preservation Office, Homer Garcia, Jamal Moreno, Ross Hosea, who is the head arborist, three of the four volunteer arborists, and Moises Cruz, who was the engineer, who came and said, here's my pier and spandrel. And the specific purpose of this meeting was, can we save more trees? And they had a lengthy meeting and discussion of it. And they went to the site and they toured the site and they measured and they walked the walls. And at the end of all of that, they determined, you know, we can't save any more trees. Okay, and where's the record site for we can't? In other words, it's impossible. Not just as the district court, its term was it's impractical. Because my concern is impracticality probably doesn't suffice under strict scrutiny. ROA. Okay. ROA 4661 through 63. All right, that's the site you gave us before. Yes. That's just, not only that's the meeting where they considered it, but there we'll find, no, we can't do it. It's not feasible. What she said is no additional trees would be saved. Oh, if they used their method. Yes. No additional trees would be saved. Was that the district court's finding? I thought the district court's finding. That is the testimony of Shannon. No, but when the district court said it would be impractical, that doesn't sound like it wouldn't do any better for the sacredness. I don't mean to be persnickety. Do you see my little uncertainty? I see your uncertainty, but the phrase that the district court used perhaps used the word impracticable. But what the district court did is deny injunctive relief. And the evidence provided here is that no more trees would be saved. And here's another record site. I think this is a helpful discussion. The testimony of David Vaughn, and that appears at ROA 4547 through 57. And he is one of the four volunteer arborists, certified arborist, who testified about the impact of construction activities on trees. And the upshot of his testimony was that even if you don't, let's say you have to trench, even if the trench doesn't go so far to cut out a particular tree, if the trench goes a certain length and cuts off the spreading roots of the tree, that impacts the tree. The tree has been destabilized, and that tree is not likely to make it. Add to that compaction of soil. He testified that the trees in this area have very shallow root systems. And there's a hand-drawn, as part of his testimony, he had a hand-drawn schematic of a tree and how there's a root flare. So you think the record establishes there is no other way to support the walls that are indispensable than the way, there was no other option? Yes. This is the least restrictive means. There is not another means that would result in fewer trees. Just to be clear, if the pier and spandrel option were put in place, the same number of trees would be lost because of compaction? Because of compaction, because of cutting the roots, and because the factually 18 inches of excavation is not true. The excavation for pier and spandrel would have to be significantly beyond 18 inches, because you would need to excavate enough for somebody to get down there to install the spandrel. You can drill the piers with machinery, but that's heavy machinery, that's compaction. That's heavy machinery that you have to take out the canopies of trees that further impacts them. And so you can, but you can drill that with machinery, but to install, because you install the spandrel is a span of wall between the piers. And so what Mr. Groucho said to the court is, you only need to excavate 18 inches and just shove that spandrel down there, and that is not so. Okay, now, so what you're saying just factually is that the record will not support the fact that your engineering design was, quote, chosen without any consideration of plaintiff's free exercise request because it would take time and money to accommodate. That assertion is not in this record? The city said it won't do that because of time and money. Instead, what the city said, we can't do it because as many trees would die. Well, Your Honor, there are – you can cherry pick a quote here or there from this record. A witness said, no, we didn't – there may be testimony from a witness, a statement from a witness who said, no, we didn't do that because that's going to cost a lot of money, or we didn't do that. We didn't sit down with them. We didn't commission a study on this. But what the analysis for this court isn't whether there is a cherry-picked soundbite somewhere that said we didn't consider it. The question for this court is whether we have established the process, the method, the methodology that the city is advancing, the cantilever and the methodology that we are advancing is the least restrictive means and that the alternatives are ineffective. That's the standard that this court presided. If that is the method, and I'm accepting just for the sake of argument it is, where in the record will we find that there was any inquiry to the Department of Interior or the Army Corps for an exemption? Will we find that anywhere in the record? Because that would suggest you're right. They're trying everything, but they're being told no, as opposed to they're not trying anything. Will I find anywhere in this record that they asked for an exemption from Interior or Army Corps restrictions? The testimony of Shannon Miller discusses the guidelines of the Secretary of the Interior. And I'm sorry, Your Honor, I do not have the ROA site, but it is in the ‑‑ No, I know they discussed it. And she gave this explanation that the Department of Interior guidelines are not, it's not like a set of regulations where you apply for this permit and can I get an exception of this. Those guidelines appear in that they are promulgated and they are adopted by the Secretary of the Interior, but then those same guidelines are implemented by, at the state level, by the State Historic Preservation Board and it's adopted into the city's Uniform Development Code, the UDC, as part of the city's historic preservation. And she explained that this is not, it's not a permit, you can't do that. There's not a mechanism for can I have an exemption for this. And so it is the state office, the state preservation, I'm sorry, there's so many acronyms in this case. I think your answer is the same as for their proposed design. There are no exceptions ever given, so that would be impossible. And likewise, you're saying their design, the record will reflect that in truth and fact, it simply couldn't work as opposed to we don't have the time and the money for it. If it's that categorical, those are very strong statements. But there's also, Your Honor, even if they did, even if they did, the pier and spandrel is still going to have to excavate significantly back from the walls because you have to insert, the spandrel is a wall being inserted in there. So the excavation, even if you can pin from the back, which is what the exemption, which is what the dispute about the guidelines is. Can you pin from the front or pin from the back? Even if you can pin from the back, you still have to excavate a significant way back in order to be able to insert rebar and make a spandrel back there. You have to excavate far enough back so that it is safe for the workers back there. And that's not just a question of, oh, OSHA has these regulations, but for safety of the individuals working there, add to that that these walls are not straight. So you can't just make a rebar cage and stick it down there. So that even if you could, if there were no Secretary of Interior guidelines, even if you could drill through and not just pin from the back, there's significant amount of evidence that it doesn't, in fact, save excavation. It's a hopeful, in a perfect world, you could do it. It only goes back 18 inches, but the evidence was that that can't happen here. But I want to make, in my little bit of time here, I'd like to respond to a couple of things, specifically on the standard you asked about the Ling case. Well, more on Barr, I guess. Okay, and I was going to say, let me talk about Barr. Let me talk about Barr because I think Barr, and I think Mr. Grahl described it as the poll star, and I think that the Barr opinion is wholly consistent with Ling in terms of how do you, what's the right way to look at substantial burden? And here's why. The court looked at the dictionary and said, substantial burden is real versus merely perceived and significant versus trivial. And then the court analyzed, well, how do you, what's the best way to analyze that? And the court concluded that the focus needs to be on conduct. Is this burdening the conduct of the claimant? And explain that some other tests that talk about the compulsion test and the centrality test, those are not good tests for substantial burden because they require the court to assess the demands of the religion. And that's consistent with what you asked earlier, Judge Higginson, about are we then diving in? And if you ask whether something is central to the religion or is it a compulsion, are you asking the court to assess the demands? And so the Barr court concluded that those are not good tests, and you avoid the problem of digging into that if you focus on conduct. And here's the quote at page 301 of the Barr case, that you avoid the problem if, quote, the focus is on the degree to which a person's religious conduct is curtailed and the resulting impact on his religious expression. And that is consistent with sort of the analysis of the Ling case, where if the impact is to the subjective religious belief, then the court said that that is not a substantial burden. That's not something that we can measure. The Navajo Nation case. I don't mean to get into metaphysical, but whole world religions can turn on just meditation. Yes. Yes. So if you need to meditate, right, with the ecology or the spiritual wholeness, you're not saying that wouldn't be counted? No, Your Honor. What I'm saying is that the applicable law, Barr is the measure of the standard for substantial burden under TRIFRA. And what was the word? The centrality test and the compulsion test. And that appears at page 301 and 302 of the opinion. And the court concluded that what TRIFRA requires in the kind of analysis is a case-by-case, fact-specific inquiry. And our facts here are, and I want to loop back in my few seconds, I want to talk about process. Because process matters. And because the record shows that the city's current plan that it arrived at, it reflects the least restrictive means because the city went through an iterative process. And the record reflects that engineers and arborists were part of the initial planning. That the city brought in and consulted with Parks and Wildlife, State Parks and Wildlife, regarding the rookery management. It considered alternatives both at the original time and in that March 1st, 2023 meeting. It held the seven public meetings. It took input from people, including the plaintiffs, in order to try to save more trees. It modified, it refined, and it improved. And the result is an improved plan that reflects that we tried and we restricted and we restricted and we restricted. And we've arrived at the least restrictive means to advance the compelling, the undisputed compelling governmental interest of repairing the North Riverbank retaining walls. And if the court has no further questions, we urge the court to affirm. May it please the court. Texas River does not require that cities hold public hearings. It requires that government actors do not burden religion unless they do so in the least restrictive means. We know that the city does not know whether or not this is the least restrictive means because they never asked. So Jamal Moreno, project manager, was asked, Did you ever tell the design team, quote, prioritize saving trees? Answer, quote, no, I never asked that. Transcript 382. As to bird deterrence, Bill Pinnell in charge of bird deterrence for the city. Tin hasn't, quote, tried to accommodate plaintiff's religious exercise in crafting the bird deterrence. That's transcript 407. Jessica Alderson from Texas Department of Parks and Wildlife testified that she only learned of religious significance because she was deposed in this case. That's transcript 561. So when this... What about all that she just said? They went out there in March with arborists, retained arborists, volunteer arborists. They looked at all this. What about all that evidence? So that tree assessment committee letter is at ROA 2331. And if you look at that, it says that they were asked whether you can save more trees given this project design. So they said, OK, here's the way we're going to rebuild the walls. Can you find a way to save more trees? And the arborist said no. I thought they went out there to look at the design your clients proposed, the pier and spandrel. So no, the tree assessment committee was asked about the cantilever system. That's what she's referring to with the tree assessment letter. And the pier and spandrel system that was proposed by the community association, First Stop doesn't have the religious rights of resorting to T. Sean Frankie, the city's expert engineer, testified that the reason he rejected the Moses Cruz was because it required drilling through the front, which violated the Secretary of Interior. Back up a step. She said there are no trees to be cut in the sacred area. She says the city went beyond what the court allowed in terms of wholesale access, et cetera, et cetera, in the proposed area, et cetera, et cetera. So is that still a pressure point in this case? Or is it about, I mean, obviously your clients wanted to stop the whole project if they could. And I get that. But that battle was lost. The city voted. The project is there, et cetera. So, I mean, are we at a point, the main pressure points are not so much on the area of worship, trees in that area, et cetera, or dispute over how the project itself could, should, ought to be constructed when, is that where we are? No, Your Honor. And I'd like to note, first, my clients do not object to rebuilding the walls. Quote, I have no objection to the walls repaired. That's Gary Perez at 114. And thank you for letting me clarify the difference between the sacred area and the project area. The sacred area is the 20-by-30-foot area where they stand and face north to perform their services. The two trees in that 20-by-30-foot block are staying there. The project area is where the spiritual ecology is relevant. And there are 83 trees of which only 14 will remain. So, that's a big difference. And that will reduce the ability for cormorants to nest. On the bar point, the conduct, obviously, is being curtailed here because my clients need to perform ceremonies and they can't do it with objects. So, that's like Merced v. Cason, where the regulation that prohibited keeping animals for slaughter burdened the practice of slaughtering. That's like this court's DeMarco case, where prison guards destroyed a Bible and a Joel Austen book. And that was a burden on the practice of studying the scriptures. So, that is conduct. I ask that this court reverse and— What is it—I'm sorry. Ask your two ships passing in the night here. You say, what is it about the 83 trees? You want 10 cut, but what is it that requires the cutting of the 73 trees, in your opinion? The cities testified that— So, if you look at the image that we have of the sacred area, there's about 15 trees on the south bank of the river. And because there's no construction there, almost all of those trees are remaining. The northern bank, which is in the project area, that is nesting space for cormorants. And so, that is part of my client's religious practice. My clients understand that these walls need to be repaired, although that's not the government interest. The government interest is removing these trees, because that's what burdens my clients. So, my clients are being reasonable. They are saying, we understand that some trees have to be removed. But the difference between removing 10 and removing all but 14, is that the cormorants will still have a nesting canopy under an alternative, and they will not under the city's proposal. May I have one more sentence? So, we would ask that this court reverse and render an injunction with no bond that will prohibit the city from blocking access to the sacred area, that will prohibit the city from destroying trees under bond project as it's currently designed, and that will prohibit the city from employing anti-nesting measures in the two-acre project area. Thank you. Thank you, counsel. Thank you. The case is under submission. Thank you.